Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHRIS COLEMAN,
        Plaintiff,
vs.                    No. 3:17-CV-00573
CITY OF CAIRO, ILLINOIS,
JOHN BOSECKER, in His Official
and Individual Capacities,
MAYOR TYRONE COLEMAN, in His
Official and Individual
Capacities, MARTHA NICHOLSON,
in Her Official and Individual
Capacities, and LORI HESSELRODE,
in Her Official and Individual
Capacities,

        Defendants.

Deposition of
CHRISTOPHER COLEMAN
Taken February 9, 2018

Reported by Stacey Bleyer, RPR, CSR
IL CSR # 084-003358
Northcutt Reporting Service
507 Cardinal Drive
Mt. Vernon, IL 62864
(618) 242-1737

---

Page 3

1   APPEARANCES OF COUNSEL:
2   FOR THE PLAINTIFF:
3     Ms. Brandy B. Barth
       NewtonBarth, LLC
4      555 Washington Avenue, Suite 420
       St. Louis, MO 63101
5      (314) 272-4490
       bbarth@newtonbarth.com
6
7   FOR THE DEFENDANTS:
8     Mr. Jerome E. McDonald
       Black, Ballard, McDonald, P.C.
9      108 South Ninth Street
       Mt. Vernon, IL 62864
10     (618) 242-3735
       jmcdonald@illinoisfirm.com
11
12  ALSO PRESENT:  John Bosecker
                   Lori Hesselrode
13
14
15
16              INDEX
17                      PAGE
18  Direct Examination by Mr. McDonald      4
19              EXHIBITS
20  No exhibits marked.
21
22
23
24

EXHIBIT
A
exhibitsticker.com

---

Page 2

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF ILLINOIS
3
4
5   CHRIS COLEMAN,
6        Plaintiff,
7   vs.                    No. 3:17-CV-00573
8   CITY OF CAIRO, ILLINOIS,
     JOHN BOSECKER, in His Official
9    and Individual Capacities,
     MAYOR TYRONE COLEMAN, in His
10   Official and Individual
     Capacities, MARTHA NICHOLSON, in
11   Her Official and Individual
     Capacities, and LORI HESSELRODE,
12   in Her Official and Individual
     Capacities,
13
14       Defendants.
15
16       DEPOSITION OF CHRISTOPHER COLEMAN, produced,
17  sworn and examined on the 9th day of February, 2018 at
18  the Cairo City Hall, 1501 Washington Avenue, in the City
19  of Cairo, State of Illinois, before Stacey Bleyer,
20  Certified Shorthand Reporter within and for the State of
21  Illinois, in a cause now pending in United States
22  District Court for the Southern District of Illinois,
23  between the above parties.
24

---

Page 4

1       S T I P U L A T I O N
2       IT IS HEREBY STIPULATED AND AGREED by and
3   between counsel for the parties that the deposition of
4   CHRISTOPHER COLEMAN may be taken in shorthand by Stacey
5   Bleyer, CSR, RPR, and afterwards transcribed into print,
6   and signature of the deponent is waived.
7            * * * * *
8       CHRISTOPHER COLEMAN,
9   being first duly sworn to tell the truth, deposes and
10  testifies as follows:
11       DIRECT EXAMINATION
12  BY MR. MCDONALD:
13     Q   Are you ready?  Would you state your name,
14  please?
15     A   Christopher Coleman.
16     Q   Mr. Coleman, my name is Jerry McDonald and I
17  represent the city and the various other defendants in
18  this case.  Have you ever given a deposition before?
19     A   No.
20     Q   Well, I'm sure that your attorney has explained
21  it to you but let me go over a couple of things.  Our
22  court reporter here is going to take down everything
23  that's said, so I would ask that you give me a yes or a
24  no or whatever your answer is in words as opposed to

---

1 (Pages 1 to 4)

Northcutt Reporting Service
(618) 242-1737

Page 5

1   uh-huhs or huh-uhs or shaking your head.  We all talk
2   that way normally but it's hard to read later, all right?
3       A   Sure.
4       Q   I'm going to start out by asking some
5   background questions before we get into the actual
6   substance of the case.  I'm not really trying to pry but
7   I'm wanting to get a little feel for you and potentially
8   there's jurors from somewhere in this district that might
9   sit on a jury.  If I don't make any sense in a question,
10  maybe I will sometimes or I'm just being obtuse, just
11  tell me you don't understand the question because I don't
12  want you to be guessing what I'm asking and you then give
13  me an answer that doesn't line up.
14      A   Sure.
15      Q   This is relatively informal.  If you need to
16  take a break, go to the restroom, get a drink, whatever,
17  feel free.  It's not a marathon endurance test.
18      A   All right.
19      Q   Where do you currently live?
20      A   Here in Cairo, 428 52nd.
21      Q   How long have you lived there?
22      A   Ten, twelve years.
23      Q   Do you live with anybody at that address?
24      A   With my dad.

Page 6

1       Q   And his name is what?
2       A   Michael.
3       Q   And is your dad employed anywhere?
4       A   No.
5       Q   Was he employed somewhere?
6       A   He was.  He was disabled several years ago.
7       Q   Do you have relatives that live in the Southern
8   Illinois area?
9       A   No.
10      Q   So it's just you and your father?
11      A   Yes.
12      Q   Did you grow up in Alexander County?
13      A   No.  Union County.
14      Q   Pardon me?
15      A   Union County.
16      Q   When did you come to Alexander County?
17      A   Ten or twelve years ago.
18      Q   How far did you go in school?
19      A   I went through -- I got a nursing degree
20  through Shawnee.
21      Q   Is that an LPN?
22      A   Uh-huh.
23      Q   Is that yes?
24      A   Yes.

Page 7

1       Q   When did you get that degree?
2       A   Ninety-five.
3       Q   Where did you graduate from high school?
4       A   Cobden.
5       Q   What year would that have been?
6       A   Ninety-three.
7       Q   So you went right from the high school to
8   Shawnee?
9       A   I actually was taking Shawnee classes while in
10  high school.
11      Q   Did they have the dual credit?
12      A   After I got out of class, I was taking evening
13  classes so I could get in as early as possible in
14  Shawnee.
15      Q   After you got your nursing degree, did you make
16  use of that?
17      A   For a short period of time, yes.
18      Q   Where did you work?
19      A   I worked at Mulberry Manor is the first place I
20  worked in Cobden.  I worked at Union County Hospital for
21  a while and that was about it.
22      Q   Are you married?
23      A   No.
24      Q   Have you ever been married?

Page 8

1       A   No.
2       Q   After those employment stints in regard to your
3   nursing degree, what did you do?
4       A   After that I did cable contracting.
5       Q   What do you mean by that?
6       A   Working for various cable companies around the
7   country doing fiber optic splicing, switch-overs,
8   networking.  All kinds of things like that.
9       Q   Would you work on the system as opposed to
10  going into somebody's house and hooking it up?
11      A   Both.
12      Q   For how long a period did you do that type of
13  work?
14      A   Years.  I have no idea exactly how long.
15      Q   When did you last work in the cable industry?
16      A   It's been seven, eight years ago probably.
17      Q   And after you got -- did you work continuously
18  in the cable industry?
19      A   No.  Cable contracting is something that you
20  come in and you may be there for two weeks, maybe two
21  years.  It just depends on who you're working for.
22      Q   What other type of jobs did you have?
23      A   That's it.
24      Q   It was always cable industry during that time

Electronically signed by Stacey Bleyer (601-034-510-1524)                                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 9

1  period?
2     A   Cable or networking or something similar, yeah.
3     Q   Related to that subject matter?
4     A   Right.
5     Q   So then seven or eight years ago when you
6  stopped doing any cable, what type of employment have you
7  had since other than here at the city?
8     A   Here at the city.
9     Q   Besides the time you worked here at the city,
10  have you had any other employment in the last seven or
11  eight years?
12     A   No.  I partnered for a short time doing resale.
13  He had a resale here, did some resale.  Mostly took --
14     Q   Resale of what?
15     A   Just used items.  Furniture and things of that
16  nature.  Household goods.  He also transported those down
17  to Rio Grande Valley and sold down there at flea market.
18     Q   Who was that you were working for?
19     A   Wilburn Marks.
20     Q   Since the time that you last worked here for
21  the city, what have you done to support yourself?
22     A   Nothing.  Nothing much I can do.
23     Q   Why is that?
24     A   Why is that?  Because my name is pretty well

Page 10

1  known now because of being fired from here.
2     Q   Have you sought employment anywhere?
3     A   Sure.
4     Q   Where at?
5     A   I've sought employment -- I'm registered on
6  Indeed, done it through the State of Illinois website,
7  IDS website, applied at a couple of trucking companies in
8  Sikeston.  Nothing.
9     Q   And has anybody told you that they wouldn't
10  hire you because you had been fired here?
11     A   Yeah.  Pulaski County did.
12     Q   Is that in --
13     A   Pulaski County sheriff's office.
14     Q   Who was it that told you that?
15     A   I don't recall who it was when I called up
16  there.
17     Q   Did you have a formal application there?
18     A   Well, I called first to see if it was going to
19  be worth going up there and filling out an application.
20  It wasn't.
21     Q   Do you even know who you spoke to, though?
22     A   I don't recall who it was.
23     Q   Was it the sheriff?
24     A   No.  It wasn't the sheriff.

Page 11

1     Q   Do you know if it was anybody who had authority
2  to hire or fire?
3     A   I have no idea.  They knew my name and they
4  knew I got fired.  Then everybody knew.
5     Q   Even trucking companies in Sikeston know?
6     A   No.  I had no qualification.  I've never done
7  that type of work.
8     Q   Have you attempted to get employment using your
9  nursing degree?
10     A   No.  Because I can't use my nursing degree.
11     Q   Why is that?
12     A   My nursing degree, the reason I stopped working
13  as a nurse is I was accused of having a child.  It wasn't
14  mine and I fought in a legal battle for ten years and
15  they took every penny they could find, the IRS, a warrant
16  for my arrest.  They took my driver's license, fishing
17  license, hunting license, everything they could think of,
18  and they put my license under administrative suspension.
19  After ten years the mother admitted.  It was an
20  African-American child, couldn't possibly be mine, and
21  then they wiped it all out, except my nursing license had
22  been lapsed for so long, I can't renew it.
23     Q   You would have to go back and get training?
24     A   I would have to do the whole thing over.

Page 12

1     Q   The whole program just like you were walking
2  in, never had a lick of training?
3     A   Right.  Yes.
4     Q   Where did all of that litigation take place?
5     A   Union County.
6        MS. BARTH:  I apologize.  I have a terrible
7  cough.
8        MR. MCDONALD:  Let's wait a second.
9        (Off-the-record discussion.)
10     Q   (MR. MCDONALD) You told me about this ten-year
11  period of this legal battle.  When did that come to an
12  end finally?
13     A   I don't know what the exact date of it was.
14     Q   Was it before or after you were employed here
15  at the city?
16     A   It was before.
17     Q   Have you had any law enforcement training?
18     A   No.
19     Q   I think you started part-time as a dispatcher
20  in September of 2014.  Does that sound right?
21     A   It was during the summer of '14.
22     Q   And how long had it been since you had worked
23  at that point?
24     A   It had been quite some time.

3 (Pages 9 to 12)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 13

1    Q   And the last thing would have been some cable
2   outfit of some sort?
3    A   Yeah.  I ended up -- I think the last cable job
4   I did I was in Kansas, maybe Nebraska.  And my dad got a
5   pacemaker put in, diabetic, smokes, was getting pretty
6   sick, so I moved back.
7    Q   So how did you support yourself during that
8   time?
9    A   During which time?
10    Q   The time from you last worked for the cable and
11   the time you started working for the city?
12    A   Me and dad just worked it out.  Basically I
13   live there off of him pretty much.
14    Q   Okay.  He supported you in exchange for your
15   taking care of him, basically?
16    A   Right.
17    Q   Has that been true basically since you last
18   worked here up until now?
19    A   Yeah.
20    Q   Tell me how you came to start as a dispatcher
21   here at the city.
22    A   Any employment here in town is ideal.  I mean,
23   there's very little employment that is available here.
24   It's a few blocks away.  It seemed like it was going to

Page 14

1   be pretty easy work.  That was it.
2    Q   Did someone say there's a job open?  You saw it
3   in the paper?  How is it that you came to it?
4    A   I was told probably a year before I actually
5   started that there was going to be some openings down
6   here.
7    Q   Who told you that?
8    A   Jody Winbrook.
9    Q   Who is Jody?
10    A   He's a former officer here.
11    Q   Okay.
12    A   Former sergeant maybe, corporal.  I'm not sure.
13    Q   So what occurred then in the summer of '14 that
14   got you dispatching?
15    A   Well, I filled out an application numerous
16   times and I finally got a call to come in.
17    Q   And were you applying specifically for a
18   dispatch job or were you applying to be an officer?
19    A   I just put police department.
20    Q   Did you ever attempt to become employed as an
21   officer as opposed to a dispatcher?
22    A   I didn't apply specifically for a position, no.
23   There was no specific position ever listed.  There was no
24   dispatcher listing in the newspaper or something of that

Page 15

1   nature.  There was no officer in the paper.  I did take a
2   qualification test, physical test for that.
3    Q   And how did that come?  Was that after you put
4   your application in that you took the test?
5    A   Before and after.
6    Q   Did you pass those?
7    A   No.
8    Q   And those are just the physical test of
9   running, push-ups, that type of thing?
10    A   Yes.  I passed everything but the running
11   portion each time.
12    Q   So how is it then you actually started working?
13   Who did you speak to and said, Mr. Coleman, we're going
14   to hire you part-time as a dispatcher?
15    A   I spoke to John Bosecker, this gentleman at the
16   end of the table, and he said he needed somebody to fill
17   in.  He said -- I believe at the time he called me and
18   said come in the office.  At the time I think he said he
19   had 16, 17 days that month, whatever month that was, that
20   was open, and he said there should be a lot more coming
21   up and then you could work into more hours later on as
22   they open up.  And once a regular position opens up, you
23   can have it.
24    Q   So did you have any type of training before you

Page 16

1   began dispatching?
2    A   As far as specific dispatcher, no.
3    Q   In your complaint you said that you worked
4   without pay for a while to learn how to do it?
5    A   That's correct.  And that was indicated in his
6   office that day is you will take training and that you
7   have to be -- basically you have to know the system and
8   make sure it's going to work out before you're hired, and
9   that's what I did.  He also indicated that it would be
10   unpaid time, and it was.
11    Q   You accepted that?
12    A   Well, I didn't have a job and I needed a job,
13   so yeah.
14    Q   So I believe at least you pled and believe the
15   record shows in September of 2014 you actually began
16   working part-time?
17    A   As far as officially, it would have been right
18   around then, yeah.
19    Q   Okay.  And then you worked part-time until July
20   of 2015 when you went on 40 hours.  Does that sound right
21   to you?
22    A   As far as being classified part-time, yes.
23   However, most weeks were -- I was scheduled, I believe,
24   two weekends a month but yet I would work many more hours

4 (Pages 13 to 16)

Electronically signed by Stacey Bleyer (601-034-510-1524)                                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 17

1    than that; Christmas, New Year's Day.  There were a lot
2    of other sick days and things like that.  I was always on
3    call.  So I worked far more than what was actually on the
4    original schedule.  But as of July '15, then I was
5    scheduled 40 hours a week no matter what.
6        Q    Did you understand beginning at that point you
7    were on a one-year probation?
8        A    I didn't understand anything at that point
9    other than I was taking over full-time schedule,
10   full-time position, the person that was here before that
11   I was taking over her spot.
12       Q    Who was that, if you know?
13       A    Cheryl James.
14       Q    Did you understand that was a probationary
15   period of a year after you were hired full-time?
16       A    No, I was not.
17       Q    Did you ever make any inquiry into it?
18       A    I made an inquiry why I wasn't getting the same
19   benefits as the person that was there in the position
20   previously.
21       Q    To whom did you speak?
22       A    John Bosecker.
23       Q    What did John tell you?
24       A    John approached me and said would you like to

Page 18

1    take over Cheryl's schedule, and I, of course, worked on
2    these scraps of hours as I could and I'm looking to take
3    over 40 hours now, so of course I wanted that.  He said
4    we can give you 40 hours but we can't give you benefits.
5    City Hall doesn't have the money.  And I said that
6    doesn't make any sense because she makes more money than
7    I do.  And he said, well, it has to do with the state
8    budget.  I guess at the time the state budget was not
9    passed.  He said once they get that figured out, then
10   maybe we can go ahead and do that, as in give you
11   benefits and so on and so forth.
12       Q    So did you have any problem proceeding that
13   way?
14       A    I had a problem with it, of course.  I mean,
15   I'm taking over a spot that's a full-time position.  I
16   should be getting the same benefits.
17       Q    So did you tell them no, I'm not going to do it
18   because you're not giving me the same benefits?
19       A    Of course not.  I needed employment.  If I
20   refused to take 40 hours, I would cut my own throat.  I'm
21   not going to get myself fired over something like that.
22       Q    Prior to the time that you were discharged, did
23   you have any disciplinary action taken against you?
24       A    Yeah.  In January of '16.  January, I'm not

Page 19

1    sure what the date was.  It was a day that I was late.  I
2    woke up.  It was right around 2:13 or so, something like
3    that.  I went in and got the cell phone and called.  Told
4    them I was late.  Sorry I'm late.  I'll be there as soon
5    as I can.  Probably be about 15 minutes.  And I was
6    written up the next day.
7        Q    Had you ever been late before?
8        A    No.
9        Q    First time the entire time you worked here?
10       A    I was always on time, according to what the
11   schedule says.
12       Q    And that sounds like a qualifier when you say
13   that.
14       A    Yes, it does.
15       Q    Tell me what you mean by that.
16       A    Well, according to written information from the
17   chief, you are required to be here 15 to 20 minutes early
18   in order to have enough time for turnover, but that time
19   is not on the clock.  Your shift actually begins, mine
20   did, at two o'clock.
21       Q    And was that the way it was done with other
22   dispatchers?  Was that the culture, everybody showed up
23   15, 20 minutes early to do the changeover?
24       A    I have no idea.  Some showed up at different

Page 20

1    times.  Some showed up right at time.  Some showed up a
2    few minutes late.  There is no time clock.  They showed
3    up when they showed.
4        Q    So then on this one instance where you were
5    what, 15 minutes late or so, correct?
6        A    (Witness moved head up and down.)
7        Q    You got written up and got put on like 60 days
8    probation, correct?
9        A    That's correct.
10       Q    And do you think there was some reason directed
11   at you that that occurred?
12       A    Seeing as how no one else was written up, yes.
13       Q    What do you think that reason was?
14       A    I have no idea for sure what the reason was.
15       Q    Was it because you're a man?
16       A    I don't believe so.  It is possible.
17       Q    Had you had any friction with Mr. Bosecker up
18   to that point?
19       A    No.
20       Q    During the time that you worked as a
21   dispatcher, did you ever take classes on line?
22       A    Sure.
23       Q    And I'm actually talking classes that would be
24   related to law enforcement in some fashion.

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 21

1    A   That would be through Law Enforcement Training
2  and Standards Board, yes.
3    Q   Do you know how many classes you took?
4    A   How many I've taken on line?
5    Q   How many you took while you were employed here?
6    A   Through that specific entity or through others?
7    Q   Well, any entity while you were employed here?
8    A   Over a hundred.
9    Q   Did you receive certificates for those?
10   A   Yes.
11   Q   Let me just talk specifically then about the
12 Illinois Law Enforcement Training and Standards Board.
13 Those were on-line courses?
14   A   That's correct.
15   Q   How many courses do you think you took through
16 that entity?
17   A   Half a dozen.  I'm guessing.  I don't know for
18 sure.
19   Q   And how does one go about taking one of those
20 classes?
21   A   You go to the website, put your information in,
22 who you're employed by, what you do, Social Security
23 number, all kinds of identifying-type things, and then
24 they issue you a user ID and password, and then they

Page 22

1  authorize you for whatever training you can take.
2    Q   Did you ever have a -- did you ever work for
3  Cook County Department of Corrections?
4    A   No.
5    Q   Do you know what a PTB number is?
6    A   Yes, I do.
7    Q   What is that?
8    A   That's where you're getting Cook County
9  Corrections at because I was told that there was a number
10 issued but I've never been to Cook County.
11   Q   A number issued to you?
12   A   Well, to that name.  To my name.  And I don't
13 recall who it was I was talking to about they assume that
14 was me but I haven't been to Cook County.
15   Q   Did you ever have a discussion with the chief
16 about taking these classes?
17   A   Taking those specific classes?
18   Q   Yeah.  The classes through the Illinois Law
19 Enforcement Training and Standards Board?
20   A   Sure.  He had authorized dozens.
21   Q   Dozens for you?
22   A   Yeah.
23   Q   Did he ever tell you weren't supposed to be
24 taking them?

Page 23

1    A   After I took them.  After I took those
2  specifically.  There were numerous classes that I took
3  prior to that which will have his signature on it which
4  was submitted to the training board with class name which
5  were taken at John A. Logan for the most part.  One was
6  at Vienna Police Department.  The only reason they had
7  the on-line classes is that, there again, the Illinois
8  budget kicked in or didn't kick in and they had to train
9  on line.
10   Q   You're saying that he told you you weren't
11 supposed to take those classes after you had already
12 taken them and when he had already authorized them?
13   A   He didn't authorize these specifically.  Those
14 were posted on the board.  It says on-line training is
15 available, so and so forth.  It's on the board that
16 hangs right outside here.
17   Q   Is that on-line training for dispatcher or is
18 that for police officer?
19   A   It doesn't indicate either way.  It simply said
20 due to the budget, there are no on-site classes.
21   Q   Did you ever take a class on line through that
22 board after John told you not to?
23   A   No.
24   Q   Let's talk about Marty Nichols (sic).  In your

Page 24

1  complaint you indicate that you spoke to her some time
2  after becoming a 40-hour employee about union membership,
3  correct?
4    A   Correct.
5    Q   You say July of 2015 in your complaint, best
6  you know date wise, I assume?
7    A   Yeah.  Well, in the beginning of taking over 40
8  hours a week, she is the union steward so I assumed she's
9  the point of contact that should be submitting whatever
10 she needs to submit to put me into the union.
11   Q   So how did that come about?  Did you go up and
12 have a conversation with her?
13   A   Yeah.  What do I need to do?  I mean, that was
14 my first thing was, okay, I'm here 40 hours.  The person
15 before me was in the union.  She's the steward, so I said
16 what do I need to do?
17   Q   Okay.  And what was her response?
18   A   I couldn't get any response out of her.  I
19 didn't qualify.
20   Q   So you did get a response.  You got a response
21 you don't qualify?
22   A   I got a blowoff.  I did get a response, yes.
23   Q   And I just need to know what words she said.
24   A   Yes.

6 (Pages 21 to 24)

Electronically signed by Stacey Bleyer (601-034-510-1524)                                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 25

1    Q   And her words were you don't qualify?
2    A   Yes.
3    Q   And was this one time?
4    A   No.
5    Q   How many times would you say that you inquired
6    about union membership and she blew you off?
7    A   In the whole period of time?
8    Q   Yeah.
9    A   Twenty, thirty.
10   Q   And, Mr, Coleman, I'm sure you can't remember
11   every date and I'm not going to pretend to ask you that.
12   But the 20 or 30 times that you estimate, would have
13   been from July of 2015 all the way up to your termination
14   that you made inquiry of her?
15   A   Yes.
16   Q   Kind of on an every so often, you would say?
17   A   Well, just at random times when I was thinking
18   about it was like, you know, it's been a while since I've
19   said anything, I'll ask again.  After a while it just
20   become just no response at all.
21   Q   So if you say to her what do I need to do to
22   get in the union, she would just not say a word?
23   A   Yeah.
24   Q   Did you make inquiry of any other person about

Page 26

1    union membership?
2    A   I did finally.  It would have been around
3    December of '15, maybe January of '16.  First of January
4    '16.
5    Q   To whom did you speak?
6    A   And I sent an email to the Laborers Local 773
7    in Marion.
8    Q   Do you know, was that to a specific person or
9    just to the board?
10   A   I tried --
11   Q   Or the local, I should say?
12   A   I tried to find that original email but I don't
13   know where it's at.
14   Q   So you best that you remember, what did your
15   email say?
16   A   My email told them who I was, where I worked,
17   the situation, that I started working some time ago 40
18   hours a week.  The person before me was getting union
19   benefits.  Why was I not being put in the union?  Was
20   there something else I needed to do?  Was there someone
21   else I needed to speak to to get into the union, fill out
22   different forms or whatever?
23          I got a response a couple of days later.
24   They indicated they made a phone call to the city.  They

Page 27

1    didn't indicate who they talked to, and that there was no
2    one at the city who was not enrolled who was qualified to
3    be in the union, and that was it.
4    Q   And you don't have that email back, I guess?
5    A   I do not.  It may be -- I may be able to get
6    that.  It was done through Laser Net.
7    Q   Through what?
8    A   Through Laser Net Wireless who was the local
9    Internet provider and is probably stored on a server
10   somewhere.
11   Q   But their response was everybody who is
12   eligible to be in the union is in the union?  Is that
13   what you're telling me?
14   A   They had contacted the city and that everybody
15   that was supposed to be in the union was in the union.
16   Q   Okay.  And so what did you do with that
17   response?
18   A   Well, once I got that response, once I got no
19   from the union steward, I got no response from the union
20   itself, I had no other options.
21   Q   Did you speak to anybody with the city about
22   whether, in fact, a phone call had even been made?
23   A   No.
24   Q   And you don't know supposedly who would have

Page 28

1    passed that information on to the local?
2    A   I assume it would be the union steward.  If I
3    were guessing and I were in the union, I would be calling
4    the union steward.  There again, I had pushed to the
5    point of calling the union directly.  I didn't want to go
6    much further.
7    Q   Why didn't you sue the union?
8    A   Why didn't I sue the union?
9    Q   Yeah.
10   A   At that point I didn't want to make too many
11   more waves that were already made.  I was looking to keep
12   my job even though I wasn't getting the benefits I was
13   entitled.
14   Q   Any more conversations with Marty Nichols other
15   than what you've told me, these 20 to 30 times you made
16   inquiry and she either said you don't qualify or she just
17   ignored you, basically?
18   A   No.
19   Q   That would be the sum and substance of all
20   conversations that you had with Marty about the union
21   position; is that true?
22   A   That's correct.
23   Q   At some point in time you -- well, one aspect
24   of your case is you contend that you're being

7 (Pages 25 to 28)

Electronically signed by Stacey Bleyer (601-034-510-1524)          17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 29

```
 1    discriminated against because of your sex, correct?
 2        A   Correct.
 3        Q   At the time that you went full-time in July of
 4    2015, how many dispatchers were there; do you remember?
 5        A   I guess we had five.
 6        Q   And what would be the breakdown as far as male,
 7    female?
 8        A   At the time there were just two females.
 9        Q   Who would that be?
10        A   Martha Nicholson and Jennifer.  I don't know
11    what her last name is.
12        Q   And at the time that you left in February of
13    2016, was that still the same?
14        A   A female was hired.  There was three females
15    then.
16        Q   That was a female that was hired prior to your
17    termination?
18        A   No.
19        Q   She replaced you; is that what you're saying?
20        A   The part-time female that was here before, that
21    was here working part-time while I was working part time,
22    took over my position for a short period of time and they
23    hired a part-time female, another part-time female.  And
24    that's when the county sheriff's office was closed, there
```

Page 30

```
 1    again, due to budget and that kind of thing.  Then when
 2    they opened back up, she went over there, and the female
 3    that was part-time then filled that spot.
 4        Q   And has anybody told you that you were
 5    terminated from your position because you were male?
 6        A   No.
 7        Q   Do you believe that's a factor in your
 8    termination?
 9        A   I was told that Martha Nicholson only wanted
10    female dispatchers, yes.
11        Q   Who told you that?
12        A   Vernon Stubblefield.
13        Q   And Vernon was a dispatcher?
14        A   Still is, as far as I know.
15        Q   And do you think that Marty Nichols was able to
16    influence your termination because she wanted females?
17        A   Absolutely.
18        Q   And what's your basis of that?
19        A   Thirty-five years of employment.
20        Q   Hers, you mean?
21        A   Yes.
22        Q   I mean, do you know of any actual contact
23    between Marty and anybody who actually had power to fire
24    you asking that you be terminated because I want a woman
```

Page 31

```
 1    in here?
 2        A   I don't think that's anything anybody is going
 3    to tell me, no.
 4        Q   I just need to know.  That's your belief.  You
 5    think that's what occurred?
 6        A   The only thing I was told, and it was not told
 7    specifically about firing me, was that Marty is playing
 8    the game and you're losing.  That statement was made by
 9    John Bosecker.
10        Q   When was that statement made?
11        A   I couldn't tell you the exact date of that.
12        Q   Well, close to the time that you were
13    terminated?
14        A   Yes.
15        Q   Within a month or so?
16        A   Within a month or so.
17        Q   Would it have been around the time that you got
18    probation?
19        A   Yes.
20        Q   And Marty wrote a note, didn't she?
21        A   She apparently typed something, yes.
22        Q   Do you think that that influenced your getting
23    probation?
24        A   That influenced disciplinary action.  I don't
```

Page 32

```
 1    know about probation, but yes.
 2        Q   You got 60 days probation, didn't you?
 3        A   Yes.  And a day off.
 4        Q   And was it during that process when John was
 5    disciplining you that he said that Marty is playing the
 6    game and you're losing?
 7        A   He said it more than once, prior to and during.
 8        Q   Prior to the discipline?
 9        A   Yes.
10        Q   And did he explain what he meant by playing the
11    game?
12        A   No.
13        Q   What did you take it to mean?
14        A   I really didn't want the specifics of it.  It
15    was already a bad enough situation as it was.  I wasn't
16    going to get into a fight.  I wasn't going to question
17    too much.  There obviously were already issues going on.
18    I didn't put him in a corner and try to get information
19    out of him.
20        Q   What issues were going on?
21        A   Well, as far as me not getting union benefits.
22    There were numerous things going on.  She says I'm late
23    because I'm not here 15, 20 minutes early.  We also had
24    issues with the roof leaking and OSHA problems and the
```

8 (Pages 29 to 32)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 33

```
 1    floor buckling and various other problems.
 2        Q   Is Marty involved in those?
 3        A   I don't know.  There again, when I asked her
 4    about the union and she doesn't give me a reply, we're
 5    probably not going to have a meaningful conversation, so
 6    I didn't ask her about anything else.
 7        Q   But getting back to this comment that she's
 8    playing the game, you don't really know what was meant by
 9    that?
10        A   I assume that she was lodging complaints or
11    trying to cause trouble or things of that nature.
12        Q   And it's your belief that that was gender
13    related, that she was doing this because you were a male?
14        A   And there were things well before that, before
15    I could actually work officially.
16        Q   What was that?
17        A   Before you can work officially you have to go
18    through the unpaid training period.  You also have to
19    have an FBI check with fingerprints, so on and so forth,
20    an ID number issued by the Bureau of Identification.  My
21    number never came through, and we waited and we waited.
22    And you have to have that ID number in order to take the
23    state mandatory test in order to access the system.  So
24    we waited.  I kept calling the chief.  The chief was
```

Page 34

```
 1    supposed to talk to her, and apparently, according to
 2    him, she was calling and they just hadn't gotten to it
 3    yet.  So finally I had waited long enough.  I made a
 4    phone call.  Thirty minutes later my ID was there.  It
 5    was already done.  It was in the bottom of a stack of
 6    papers.
 7        Q   Bottom of a stack of papers where?
 8        A   Bureau of Identification.  State Police Bureau
 9    of Identification.
10        Q   Did it get to the bottom because of Marty or
11    because of the state?
12        A   I have no idea.  I don't have that knowledge.
13        Q   I'm just trying to figure out how we connected
14    the fact that you're a male and Marty doesn't like you
15    because you're a male and you don't get your number.
16        A   It was an unusual amount of time and that's why
17    I called.
18        Q   Based on what experience that you have to
19    determine what is usual or not unusual?
20        A   Because I was told by the chief normally they
21    come in before this, before now, and my background had
22    already been run before.  I had fingerprints for the ATF
23    was done, for firearm owner's permit, and so it should
24    have been fairly easy to do an FBI background check
```

Page 35

```
 1    because it had been done recently.
 2        Q   Do you have any information that Marty somehow
 3    threw a cog or a wrench in the wheel and screwed it up?
 4        A   That particular case, no.  However, once she
 5    got in the system and I was certified and hung my
 6    certificate on the wall saying I was good for two years,
 7    I think, maybe three, it was probably two to three weeks
 8    later and I had already started working I was told I
 9    couldn't work any more.  Marty got a phone call and they
10    give me an ID number by mistake, and I was disqualified,
11    and I had to take time off.  And I was informed of that
12    from John Bosecker.
13        Q   Okay.
14        A   And I took time off.  And until -- it was
15    supposedly the head of the agency had to review it and
16    give the okay and Marty was supposed to be making phone
17    calls back and forth.  Nothing ever happened.
18        Q   Do you know if she, in fact, did something to
19    get you disqualified?  Do you think that she did
20    something that it came back bad and you had to sit out
21    for a while?
22        A   Well, I did have to sit out for a while.
23        Q   I understand that.
24        A   I don't know what the cause was.  All I know is
```

Page 36

```
 1    I was working.  I had my ID number.  I passed my test
 2    92 percent or whatever it was.  Everything was fine and
 3    then I had to take time off.
 4        Q   Do you have any indication that Marty had
 5    anything to do with that?
 6        A   Yes.
 7        Q   What?
 8        A   According to John Bosecker, that she was the
 9    one that called.
10        Q   Called?
11        A   And he was told this information that I did not
12    qualify because of a prior criminal history 25 years ago.
13    And finally it come to the point, the last time I talked
14    to him, that he sent an email to them and said I'm going
15    to put him to work.  If you have a problem, I want it in
16    writing, final determination.  Nothing ever showed up.
17    So whether she was the direct cause or not, there's no
18    way for me to know that.
19        Q   You're just suspicious that it was her?
20        A   There were no other dispatchers that were done
21    like that, that started work and then were off and back.
22        Q   Do you know if they had the same background?
23        A   I wouldn't know.
24        Q   Well, so you're not really comparing apples to
```

Northcutt Reporting Service
(618) 242-1737

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 37

1   apples perhaps.  Anyway, what was the criminal history 25
2   years before?
3       A   It was misdemeanor theft, less than a hundred
4   dollars.
5       Q   When you said that Marty made the call, are you
6   saying she called somebody and said he's got this
7   criminal history, or that she received a call from the
8   state saying that there was a problem?
9       A   I don't know the sequence of events.  I was
10  told from the chief.
11      Q   How much time did you miss?
12      A   I was off two weeks.  It actually should be
13  three weeks but they had me go ahead and work for over a
14  week using someone else's ID.
15      Q   And then after that everything was all right?
16      A   Yeah.
17      Q   This was when you're part-time, right?
18      A   Yeah.  The chief said unless I receive
19  something in writing, you're going back to work.  He put
20  me back on the schedule.  I started working and we never
21  heard anything else.  Everything was fine.
22      Q   The mayor, you filed an action against him, of
23  course.  Did you have much interaction with the mayor in
24  your job as a dispatcher?

Page 38

1       A   No.
2       Q   In your complaint you talk about a time when
3   came in and there was a conversation between the two of
4   you, and you believe that to be the basis of your
5   termination or a basis of the termination?
6       A   Yes.
7       Q   You contend that your first amendment rights
8   were violated?
9       A   Yes, sir.
10      Q   That conversation would have been in
11  February 2016, correct?
12      A   Yes.
13      Q   And your normal shift was two to ten?
14      A   This was on a Saturday that it occurred.  Six
15  to two.
16      Q   Any idea about what time this occurred?
17      A   This was early in the morning.  I'm thinking
18  it's around eight o'clock, maybe nine o'clock.  It was
19  towards the beginning of the shift.
20      Q   And you were working?
21      A   Uh-huh.
22      Q   You were -- I guess, you sit at a desk.  I
23  don't know.  Do you have a headset or just use phones?
24      A   No.  Just a little cubical.

Page 39

1       Q   And were you in the cubical when the mayor came
2   in?
3       A   (Witness moved head up and down.)
4       Q   That's yes?
5       A   Yes.
6       Q   So after he walks in, tell me what happens.
7       A   He came in.  He looked at the cameras like he
8   always does.  He has a routine.  He comes through the
9   dispatch area, goes to the coffee machine which is on the
10  other side.
11      Q   Does he look at the cameras or does he look at
12  the screens?
13      A   Well, the cameras are on the screens.  We have
14  two flat screen 40-some-odd-inch TVs.  He was looking,
15  and he was looking for the turnout.  They were supposed
16  to have some kind of prayer circle or praying for the
17  city.  I don't really know what the whole event was.  We
18  weren't notified of it.  And he went and got his coffee.
19  He come back and sat behind me and was looking at the
20  cameras.  It was kind of foggy that day and he started
21  talking about the weather.  It was a little chilly.
22  Didn't know what the turnout was going to be.  And that's
23  how the whole thing started.
24      Q   And then where did it lead from there?

Page 40

1       A   It led to him -- he said something else.  It
2   was not really that important that I remembered it.  And
3   then he said he was giving $10,000 in TIF money to one of
4   the local liquor stores.
5       Q   Who was the person that he was giving it to?
6       A   Wesley Chumbler.
7       Q   How did that even come up?
8       A   I don't know.  It went from the weather to he
9   was talking about something else and then he happened to
10  mention that.  He was talking about improvements in the
11  city.  When he said he was giving $10,000 to a local
12  liquor store, that's when -- basically from the weather
13  until he said $10,000 being given away, I pretty much
14  just didn't listen to him.  He would come in and say
15  just -- he was just gossiping, general things.  But when
16  he said $10,000 and the problems we have in the city with
17  trees growing through the city and through the streets
18  and all kinds of other issues, then I kind of perked up
19  and that's when I was listening real close to what he was
20  saying.
21      Q   What was he saying then?
22      A   And he said he was going to give this money to
23  the liquor store in TIF money is what he said.
24      Q   Is that to remodel or something like that?

10  (Pages 37 to 40)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 41

1    A   I didn't know.  I asked him what it was for,
2  what he was going to do.  He said he didn't know but it
3  would be better than it was before.  And I had some
4  issues with that.
5    Q   What issues did you raise with him?
6    A   Well, he was talking something about he's not
7  as bad a guy as everybody says he is.  And I said yeah,
8  he's a bad guy.  I said, he's been in all kinds of
9  trouble, and I said he has multiple felonies.  He's all
10 over the Internet.
11   Q   You specifically used the term Internet when
12 you talked to him?
13   A   Yes.
14   Q   What's a LEADS?  What does that mean?
15   A   Law Enforcement Agencies Data System maybe.
16   Q   Had you ever run a search for -- is it Chumler?
17   A   Chumbler.
18   Q   Had you ever run a search for his criminal
19 history?
20   A   Sure.
21   Q   Why would you have had a cause to do that?
22   A   Numerous times.
23   Q   But why would you have had cause to do that?
24   A   He had a vehicle stolen one time that wasn't.

Page 42

1  Various other reasons from the officers.
2    Q   Had you looked him up on the Internet?
3    A   Had I looked him up on the Internet?  Yes.
4    Q   Why did you look him up on the Internet?
5    A   Because I had a property dispute with him and I
6  wasn't familiar with the guy.  I couldn't tell you who he
7  was.  I looked him up on the Internet to see who I was
8  dealing with.
9    Q   Had you already run his name through LEADS
10 before that, though?
11   A   I'm sure I had, yeah.  But you run lots of
12 people through LEADS.  It didn't mean anything at the
13 time.  It wasn't anything to me to run anybody's name.
14   Q   Did you tell the mayor specifically what
15 felonies or crimes that you were aware of with regard to
16 him?
17   A   No.
18   Q   You just --
19   A   I told him he was a bad guy with a lot of
20 felonies and was all over the Internet.
21   Q   What did he say to that?
22   A   He said he wasn't as bad as everybody says he
23 is.
24   Q   And was that the end of the conversation?

Page 43

1    A   That's it.  He left.  Went out the front door.
2  Went outside.  They stood around the flag pole out front
3  and had some kind of prayer meeting, whatever they were
4  doing out there.
5    Q   Have you been in litigation with Mr. Chumbler?
6    A   Yes, I have.
7    Q   What was the nature of the litigation?
8    A   Personal property.
9    Q   Personal property?
10   A   Theft of personal property.
11   Q   You contend he stole personal property of
12 yours?
13   A   That's correct.
14   Q   And he broke in your house or how did that --
15   A   He acquired a parcel, a piece of land for
16 taxes.  He took possession of not only the parcel but the
17 personal property contained inside.
18   Q   Was that a building that you owned?
19   A   Yes.
20   Q   And you lost it for failure to pay your real
21 estate taxes?
22   A   That's correct.
23   Q   And so you -- when he took the real estate, he
24 took the personal property that was inside the building

Page 44

1  is your contention, correct?
2    A   Yes.
3    Q   And then you sued him for the value of that
4  personal property?
5    A   Yes.
6    Q   Has that been resolved?
7    A   No.
8    Q   Do you have any other litigation going with
9  him?
10   A   No.
11   Q   When did this occur?  Let's say specifically
12 when did he take possession of the real estate,
13 approximately?
14   A   I couldn't tell you what year it was.
15   Q   Was it before this conversation you had with
16 the mayor?
17   A   Yes.
18   Q   So you already -- had the lawsuit been filed
19 when you had this conversation with the mayor?
20   A   Yes.
21   Q   Do you have an attorney representing you in
22 that?
23   A   I don't right now.  He died.
24   Q   Would it be fair to say you had some animosity

11 (Pages 41 to 44)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 45

1  with Mr. Chumbler?
2      A   Not until the point that he tried to
3  actually -- he damaged the locks before he had a deed to
4  the property, and I was in the property still owning the
5  property. The county had not even taken possession of
6  the property. The deed was still in my name.
7      Q   The county took possession of the property?
8      A   The county has to take possession of the
9  property and then transfer it. The trustee sells it.
10 The county takes possession, puts the deed in their name,
11 and then the county votes on it and then transfers it to
12 the final person.
13         He immediately went in in January, drilled
14 the locks out, put some kind of hardening compound on one
15 side. I was in the other side getting the property. He
16 showed up, flew in on the sidewalk, started flapping his
17 arms around, very agitated.
18     Q   Like a bird?
19     A   Like a bird.
20     Q   Literally?
21     A   Yeah. Like a bird. And I called the officers.
22 Two officers showed up and the officers threatened to
23 tase him if he didn't leave.
24     Q   All of this happened before this conversation

Page 46

1  with the mayor, though?
2      A   Yes.
3      Q   Have you spoken to the mayor at all since that
4  time?
5      A   No. The only time I saw the mayor, if there
6  was going to be a board meeting, he come over there and
7  got coffee. And he would usually stop, look at the
8  cameras, and then walk out.
9      Q   When you worked your shift, you said you worked
10 six to two on a Saturday but it was two to ten then
11 during the week?
12     A   Yeah. Every day but Saturday. Saturday was
13 the only day I worked mornings.
14     Q   Would you ever leave your shift 15, 20 minutes
15 early?
16     A   No.
17     Q   Never?
18     A   Never.
19     Q   Another aspect you have in your lawsuit is the
20 Whistleblower Act in regard to I guess you made a
21 complaint to OSHA?
22     A   Uh-huh.
23     Q   Is that correct?
24     A   That's correct.

Page 47

1      Q   Do you know when you made that complaint to
2  OSHA?
3      A   That complaint was the same day I was fired.
4      Q   So you made the complaint to OSHA the same day
5  that you were fired?
6      A   That's correct. After.
7      Q   Was it after? So that complaint to OSHA would
8  have had nothing to do with your termination, correct?
9      A   No.
10     Q   That's not correct?
11     A   That is correct, yes. It would not have
12 anything to do. It wouldn't be the reason for my
13 termination.
14     Q   The complaint you made to OSHA, what was it
15 about specifically?
16     A   Mold. Excessive mold caused from a leaking
17 roof, tile that had fallen out because it was so wet.
18 Trash cans had to be put in the hallway. The paneling,
19 much like this paneling here except darker, would bulge.
20     Q   For the record, we're sitting in the city
21 council room?
22         MS. HESSELRODE: Yes.
23     A   And then finally got the floor soaked. The
24 water got into the tile.

Page 48

1      Q   (MR. MCDONALD) In what room?
2      A   In the kitchen area.
3      Q   Was all of this in the kitchen that we're
4  talking about?
5      A   It was between the kitchen and the hallway.
6      Q   Are we talking about the kitchen in the police
7  department as opposed to the building we are in today?
8      A   Correct.
9      Q   And prior to your making a complaint to OSHA,
10 had you made a complaint to anybody with the city or the
11 police department regarding that problem?
12     A   Oh, yeah.
13     Q   To whom did you make a complaint?
14     A   I told Lori.
15     Q   How many times?
16     A   I told Lori a couple of times. The first time
17 I told her she was not aware of it. She said she would
18 have to come over and check it out because she was not
19 aware of it. She came over and looked.
20     Q   Do you have a feel for when that was, like the
21 day before you were fired or way in the beginning?
22     A   No, no, no. This was way in the beginning.
23 This was when I first noticed we had three or four
24 trashcans sitting out with water leaking into them and

12 (Pages 45 to 48)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 49

1    some of them almost overflowed.
2        Q   Was this before or after you went to 40 hours,
3    using that as a benchmark?
4        A   This would have been before.  Before, during
5    and after.  The whole period of time.
6        Q   I'm talking about the time you went and got
7    Lori and she went over there.
8        A   Lori was the first point of contact.  She was
9    contacted -- I couldn't tell you the exact day.  But the
10   first time when I came in, we usually come through the
11   back, I walked in and there was all of these trashcans
12   out full of water and it's coming out of the roof.  That
13   was pretty unusual.  So I called and said, hey, what's
14   the story here?  What's going on?  And she acted like she
15   had no idea what was going on.  And she did come over
16   there and check it out and looked at it.
17       Q   Did you make more complaints to her over time?
18       A   To her a couple, yes.  I also made complaints
19   to anybody that would listen.  I made complaints to the
20   chief.  I made complaints to other dispatchers.  I made
21   complaints to all kinds of people.  Never anything
22   official because, there again, I didn't want retaliation
23   and getting fired.
24       Q   When you say nothing official, you mean nothing

Page 50

1    in writing to anybody?
2        A   No.  I mean I didn't seek an outside agency,
3    OSHA or Department of Labor or anything like that.
4        Q   When you first complained to Lori, was it
5    basically because there was water coming in?
6        A   At that point in time, yes.  The trashcan -- I
7    believe the first time, 30-gallon trashcan or however
8    big, was about half full of water.  It was a pretty
9    excessive amount.  I didn't go over and talk to her.  I
10   talked to her on the phone from the dispatch chair area.
11       Q   Was mold an issue at that point or is that
12   something you noticed later?
13       A   Mold was an issue after the ceiling tile fell
14   in, yes.
15       Q   How long after this first time that you told us
16   about that the ceiling tile fell in?
17       A   Pieces of it fell, I don't know, over a period
18   of a couple of months or so, something like that.  And
19   then several tiles had fallen out.  And then it leaked
20   onto the floor, caused the floor to go ahead and peel.
21   People stepped on it.  It broke into little pieces and it
22   had to be replaced.
23       Q   And you complained to John Bosecker about that?
24       A   Yes, sir.

Page 51

1        Q   Numerous times?
2        A   Yes.
3        Q   And what kind of responses did you get?
4        A   They're working on it.  They're looking into
5    it.
6        Q   Do you have any reason to doubt that they were
7    working on it or looking into it?
8        A   I do.  I think if I myself was looking into it
9    or working on it and had a mold problem, I would have got
10   it done sooner than what they did.  The issue was not
11   addressed.
12       Q   It was eventually?
13       A   It was eventually.  But we're talking about
14   these trashcans.  Every time it rained, every time there
15   was snow, if there was snow it would sit and leak for
16   three or four days.  I can see the roof leaking once or
17   twice, you have to put the trashcans out and then you get
18   the roof fixed.  But not, well, it's going to rain, let's
19   put the trashcans out.  That didn't seem like a very good
20   resolution.
21       Q   Anyway, you filed your complaint the day of
22   your termination, after, some time later that afternoon
23   or whatever?
24       A   It was either that day or the next day, yes.  I

Page 52

1    believe it was the same day.
2        Q   Did you already have it ready to go or did you
3    decide that after you got fired you wanted to file an
4    OSHA complaint?
5        A   At that point I had nothing to lose.  I was
6    already fired.  If I did it prior to being fired, I
7    probably would have been fired.
8        Q   What happened with that, if you remember, with
9    that complaint with the Illinois Department of Labor?
10   That's who handled it, correct?
11       A   That's who handled it, yeah.  I have no idea
12   what.  I believe they did a walk-through.  You should
13   have documentation on it.
14       Q   I mean, it's part of your complaint that you
15   were fired because of retaliation for turning them in.
16   You filed something with the Department of Labor in that
17   regard, didn't you?
18       A   Yes.
19       Q   Do you know what happened with that?
20       A   I don't know what the outcome was.
21       Q   Do you know they found against you?
22       A   No.
23       Q   There was never an appeal taken on that issue?
24       A   I don't know what was forwarded to who or --

13 (Pages 49 to 52)

Electronically signed by Stacey Bleyer (601-034-510-1524)          17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 53

1    no. I have no documentation on it.
2        Q   But regardless of the filing of the complaint
3    with OSHA regarding the mold and water, et cetera, that
4    didn't result -- that didn't cause your termination?
5        A   No. That in and of itself. I complained the
6    whole time.
7        Q   It didn't play any role in it, did it?
8        A   Sure it did.
9        Q   You hadn't even filed it. How could it?
10       A   The filing, that particular filing, of course,
11   could not have resulted in termination. Obviously it was
12   after termination. However, the problems that resulted
13   from the mold being present, the water leaking up to that
14   point, yeah, that was a problem, and I complained about
15   that problem. And that problem only existed when I would
16   come into the building and it happened with other people,
17   too.
18       Q   What do you mean?
19       A   There was sinus kind of symptoms when you would
20   be working, and that's right by the dispatch area. Now
21   like I said, the actual filing itself, no.
22       Q   And you didn't -- I think you already told me
23   you didn't notify anybody else, no outside agency, until
24   after your termination?

Page 54

1        A   That's correct.
2        Q   The only complaint you made were to folks here
3    at the city?
4        A   Were in house, yes. That's right.
5        Q   What's the current status of that case with
6    Mr. Chumbler; just sitting there since you don't have an
7    attorney?
8        A   ARDC has control over it right now. All of the
9    records were with the lawyer.
10       Q   Who was that?
11       A   It was James Karraker. And his wife basically
12   sealed the office and everything apparently is still
13   inside it. They went in and scheduled it for a status
14   hearing but they've scheduled that for a status hearing
15   the same day that we're to be in East St. Louis, so
16   that's been filed with the circuit clerk to reschedule
17   that.
18       Q   In February?
19       A   (Witness moved head up and down.)
20       Q   We've luckily got it changed. That date is
21   changed. We just got it yesterday.
22       A   I had to file a motion.
23       Q   Okay. Let me ask you a couple more questions
24   in regard to your gender discrimination claim.

Page 55

1        A   Okay.
2        Q   In your complaint you contend that you continue
3    to complain about and report gender discrimination. To
4    whom did you report gender discrimination?
5        A   Well, the gender discrimination basically
6    results from lack of benefits.
7        Q   No. My question though is: To whom did you
8    complain about gender discrimination?
9        A   That would be Martha Nicholson and that would
10   be Chief Bosecker.
11       Q   And you told Chief Bosecker that you were being
12   discriminated against because of your sex, your gender?
13       A   That I believed that at least contributed to
14   it.
15       Q   You specifically talked about your gender as
16   opposed to some other reason that she wasn't treating you
17   right?
18       A   I didn't give any other reason, no. I just
19   said she, Martha Nicholson, is not giving me the
20   benefits, not signing me up for the benefits, not being
21   cooperative, not giving me any information, whereas the
22   person before had these benefits. She's the steward.
23   She should be doing something. And so I went to the
24   chief and said, hey, what's the story here? Since she

Page 56

1    was steward, she's supposed to be the controlling party
2    in that.
3        Q   Did you say it's because I'm a man?
4        A   I didn't use those specific words, no.
5        Q   So let's talk about your termination.
6        A   Okay.
7        Q   That particular day, what was your first notice
8    that something was going on, so to speak?
9        A   The notice was -- it was the week before. It
10   was on a Thursday, and this was -- I'm thinking it was
11   around two in the afternoon, something like that. I
12   received a text message that said I need to be in the
13   chief's office Monday, ten o'clock. And at the time --
14       Q   I want to clear one thing up. I think there
15   was a typographical error in the original complaint. It
16   says there that the mayor called and told you you need to
17   be in the mayor's office at 10:00 a.m. That's inaccurate
18   and has been fixed, right?
19       A   Right.
20       Q   I'm sorry. I didn't mean to interrupt. You
21   got a text message from John?
22       A   Yes. I know it was on a Thursday because I was
23   at Guetterman Motors getting a new van. My father's van
24   had broken down and we were getting a new van, so I know

14 (Pages 53 to 56)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 57

1   exactly where I was at, sitting in the sales office and
2   got a text saying I need to be in his office at ten
3   o'clock Monday morning which was the following Monday.
4       Q   So the text is on a Thursday, and that next
5   Monday I believe is February 15?
6       A   That was the termination, yes.  I walked
7   outside the sales office while my dad finished signing
8   his paper work.  I called the chief, tried to find out
9   what was going on.  He said, we'll talk about it when you
10  get in my office on Monday.  That was it.
11      Q   Did you work between that text and the time
12  that you met?
13      A   Yes.  Thursday was my regular day off.  Friday
14  two to eleven I worked.  The chief worked until 3:30,
15  maybe four o'clock.  Didn't say a thing.
16      Q   Did you ask him anything?
17      A   Yeah.  I asked him what was going on.
18      Q   So you asked him again in addition to that
19  phone call?
20      A   Yeah.  He was right there in front of me.
21  We'll talk about it Monday.
22      Q   So then Monday comes?
23      A   Monday comes.
24      Q   And you wouldn't have worked yet that day, I

Page 58

1   mean?
2       A   Not that day, no.
3       Q   Your shift wouldn't have been until two?
4       A   Not until the afternoon, yes.
5       Q   So you arrived where, at his office here?
6       A   Yes.
7       Q   And who else was there?
8       A   When I arrived, John Bosecker was sitting at
9   his desk in his office, the chief's office.  He had a
10  couple of kids in there.  Seems like a couple of little
11  girls were in his office.  And he said go have a seat for
12  a minute.  We're going to wait for Danny.  Danny would be
13  Danny Brown.
14      Q   Is Danny Brown somebody that you knew before
15  this?
16      A   He was the police commissioner.
17      Q   Did you have a relationship with him at all?
18      A   No.  No.  So I went and sat in the dispatch
19  area which has got an extra chair there and I waited.
20  The kids that were in there, I don't know where they went
21  to.  I guess they went outside.  Danny Brown finally
22  showed up.  I think it was a few minutes after ten that
23  he showed up.  And then the chief said he was ready for
24  me and then I went in the chief's office.

Page 59

1            Danny Brown sat in the first seat, I sat
2   in the second seat, and the chief was sitting in his
3   seat.  The chief had some papers.  I don't know how many
4   papers.  I don't know what they said.  I never got a copy
5   of them or anything else.
6       Q   Did you get any paper work ever after your
7   termination?
8       A   No.  Not before, during or after.  And the
9   chief start going through things.  He said -- first thing
10  he said was he had a complaint from the major that I
11  released a criminal history on Wesley Chumbler to the
12  mayor.  I told him I didn't.  I told him criminal
13  histories are public record.  Anybody with Internet
14  access can find them.  They're all over the place.
15      Q   You would agree that you can't release
16  information that you get off of LEADS to the public,
17  correct?
18      A   You cannot release specific information, that's
19  correct.
20      Q   You couldn't release it even to the mayor?
21      A   That's correct.
22      Q   I'm sorry.  Go ahead.
23      A   There's a big distinction between what I said
24  to the mayor and what would come off a LEADS computer.

Page 60

1   If I would have said to the mayor that you were
2   incarcerated for 16 months for this crime and this and
3   this and this, that's one thing.  If I say I see a
4   mugshot and, you know, you were incarcerated for murder
5   on the Internet, I can say you're a bad guy or I could
6   say you were convicted of murder.  That information is
7   posted on the Internet.  But what he said was the mayor
8   wanted me fired.
9       Q   He specifically said the mayor wanted you
10  fired?
11      A   Yes.  The mayor made a complaint and he wanted
12  me fired and I shared this criminal history with him.  He
13  also said that it can be construed as a criminal offense.
14  I could be convicted of a crime.
15      Q   And do you know what he's talking about or was
16  talking about?
17      A   Releasing LEADS information.
18      Q   You would agree that that is a crime?
19      A   That is a crime.  I also told him that's public
20  information.  It's on the Internet.  He didn't believe
21  me.  In fact, what he said was, I'm not going to call you
22  a liar, but I don't believe you.  And he didn't call me a
23  liar but he didn't believe me, and it is on the Internet.
24           And I told him the whole story about what

Electronically signed by Stacey Bleyer (601-034-510-1524)                                    17fe6e1d-17a1-4258-8144-26f8282d7e91

---

Page 61

1 the mayor said, so on and so forth. And then he was
2 talking about me being late, about not showing up 15, 20
3 minutes early, and shuffled through several different
4 papers. He asked if I took on-line training. I said
5 absolutely I did. I've taken all kinds of on-line
6 training and I still do to this day. And that was about
7 it.
8    Q  Did he make any comment about the on-line
9 training, that you weren't supposed to be doing certain
10 things, taking certain classes?
11   A  Well, he said he got a phone call. In fact, he
12 said he got an ass chewing, is what he said, over me
13 taking these classes.
14   Q  From whom?
15   A  That was supposed to be redacted and he didn't
16 tell me.
17   Q  Who chewed his ass?
18   A  You would need to talk to him. Somebody from
19 the training board. And that was pretty much it. Danny
20 Brown's comments were, he said -- he asked me about the
21 mayor conversation and all of that, and the mayor said he
22 was going to give the money to Wesley Chumbler, said it
23 was going to be $15,000. And he said, Tyrone said that?
24 No, no. It's $10,000 he's going to give him. I'm going

Page 62

1 to talk to him as soon as I get out of here. He seemed
2 rather animated about that. And then he asked, he said,
3 did you take some classes on line? And I said yes, I
4 did. Okay. That's all I wanted to know. And that was
5 all that Danny Brown had to say.
6    Q  The mayor did say $10,000, according to your
7 story?
8    A  $15,000.
9    Q  He said fifteen to you?
10   A  Yes.
11   Q  Earlier today you said ten.
12   A  It was $15,000.
13   Q  Anyway, any more said by anybody?
14   A  That was it.
15   Q  Did the chief start by saying you're being
16 terminated and here's why, or did he tell you that at the
17 end?
18   A  No. He started off by saying that the mayor
19 wanted me terminated. The mayor made a complaint that I
20 had shared this criminal history.
21   Q  What was your perception of why the mayor would
22 do that?
23   A  At that point I had no idea.
24   Q  Your comments to the mayor that you've asserted

Page 63

1 are protected by the first amendment, did you make them
2 that day to anybody else other than the mayor?
3    A  No.
4    Q  It was just the two of you talking, correct?
5    A  Yes.
6    Q  So after that day then, you left and I guess
7 you went and filed the complaint with OSHA?
8    A  I did. Prior to leaving the office -- of
9 course, I left with nothing, no papers, nothing. And I
10 said -- I did ask him, I said, okay, so you've already
11 got my shift covered today, which was Monday, which I
12 would normally work two to eleven. He said yes, you're
13 terminated effective immediately. And I said okay. I
14 walked out. He patted me on the back and said no hard
15 feelings now, and I walked to my locker, I got my stuff,
16 and I left the building.
17   Q  Did you reply to the no hard feelings comment?
18   A  No.
19   Q  Since that day have you had any conversations
20 with John Bosecker?
21   A  No.
22   Q  Have you had any conversations with Lori here?
23   A  No.
24   Q  I think you already told me you haven't spoken

Page 64

1 to the mayor. Is that true?
2    A  That's true. Yes.
3    Q  Marty Nichols, have you spoken to her?
4    A  No.
5    Q  Have you spoken to anybody at the city in
6 regard to the issues that have been raised in your
7 complaint?
8    A  No.
9    Q  I think at one time you said something about --
10 is it Vern Stubblefield?
11   A  Vernon, yes.
12   Q  Indicating that Marty only wanted women working
13 dispatch?
14   A  Uh-huh.
15   Q  When was that?
16   A  Well, there was numerous times throughout
17 employment. The same thing was said by Don Beggs, which
18 was their night dispatch, that Marty didn't want me hired
19 in the first place. She only wanted females hired.
20   Q  And the reason she didn't want you hired is
21 because of your being a male as opposed to some other
22 reason?
23   A  Well, when I'm told she only wanted females, I
24 assume so.

16 (Pages 61 to 64)

Northcutt Reporting Service
(618) 242-1737

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 65

1      MR. MCDONALD:  Let's take five minutes if you
2  don't mind.
3      MS. BARTH:  No problem.
4          (A recess was taken.)
5      Q    (MR. MCDONALD) Mr. Coleman, getting back to
6  when you were speaking with the mayor in the dispatch, I
7  may have already asked you this.  I just want to be
8  clear.  The only thing you told the mayor was he was
9  basically a bad guy as opposed to saying he got arrested
10  for this, he got convicted of this, and blah, blah, blah?
11     A    That's correct.
12     Q    You gave no details other than you made a
13  general statement about his character as you perceived
14  it; true?
15     A    Right.  I said he's a bad guy, lots of
16  felonies.  He's all over the Internet.  But I didn't say
17  he was convicted of a double murder in this town.  It was
18  just a general, hey, this is a bad guy and I live in town
19  and we've got bigger problems here that we could be
20  addressing instead of giving this guy money.
21     Q    In your complaint you allege that you could
22  only be discharged for cause and after hearing.  What is
23  your basis for saying that, if you know?
24     A    My lawyer would take care of that.

Page 66

1      Q    Okay.  I mean, I know that she wrote this
2  complaint.  I assume you did not?
3      A    That's true.
4      Q    Do you know of any basis for saying -- any
5  documentation, rule, contract that says you can only be
6  discharged for cause and after hearing?
7      A    It is public appointment.  Public appointment
8  is subject to due process.
9      Q    You know of no document, no rules or anything
10  that says that you got that, but it's your understanding
11  that under the law you got it merely because it's public
12  appointment?
13     A    There is a statute.
14     Q    What statute is that?
15     A    You're the lawyer, not me.
16     Q    Well, you said it.  I thought you might already
17  know what it is.
18     A    If I don't know the answer, I can find it.  You
19  can ask the chief then.  You can ask me a question.  If I
20  don't know it, I can find it.  But there is a statute,
21  yes.
22     Q    So your understanding is that statute says
23  anybody who's employed with a public body can only be
24  discharged for cause and with a hearing?

Page 67

1      A    That's correct.  Illinois is not an at will
2  state when it comes to public employment.
3      Q    We've sat through an hour and a half or
4  whatever it was.  Are there any answers you gave that you
5  think might have been incorrect and you want to change
6  now?
7      A    Well, my initial conversation with the mayor, I
8  think I mentioned, like you said, 10,000 which was 15,000
9  when I talked to the mayor, the initial conversation that
10  we had in the dispatch office or dispatch cubical or
11  whatever you want to call it.  Other than that, no.
12     Q    Have you kept records of your employment
13  searches since your termination?
14     A    Some yes.  Most no.
15     Q    Maybe I should know this but I don't.  Did you
16  draw unemployment?
17     A    I did.
18     Q    Has that run out at this point?
19     A    Yes.
20     Q    During the time that you were drawing
21  unemployment, did you have to provide the state with
22  documentation of where you sought employment?
23     A    Yes.
24     Q    Did you keep any of that?

Page 68

1      A    I've got that somewhere, yes.
2      Q    How long ago did the unemployment run out?
3      A    Oh, it's been quite a while.  I don't know
4  exactly how long.
5      Q    You have six months maybe?
6      A    No.  It's been longer than that.
7      Q    Did you receive six months' benefits?
8      A    I don't think so.  I don't recall what the
9  exact time period was.  Initially the city fought it and
10  it went on for a couple of months before they determined
11  that I was eligible.
12         MR. MCDONALD:  That's all of the questions I
13  have for you, sir.
14         MS. BARTH:  Okay.  We'll waive.  Well, do you
15  want to read it before you certify it?  She's been taking
16  down everything.  You can't change your answers.  It's
17  just if she misspelled a name or heard a word different
18  than what you think you said, otherwise we can waive
19  service.
20     A    That's okay.
21         MS. BARTH:  We'll waive service.
22            (End of deposition.)
23
24

17 (Pages 65 to 68)

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91

Page 69

1    STATE OF ILLINOIS    )
                         ) ss.
2    COUNTY OF WILLIAMSON  )

3

4        I, Stacey Bleyer, a CSR, RPR and Notary Public in
5    and for the County of Williamson, State of Illinois,
6    certify that the foregoing proceeding was held at the
7    time and place therein stated; that the witness was
8    placed under oath by me as a Notary Public; that the said
9    proceeding was taken down in machine shorthand by me and
10   thereafter transcribed into print by me using
11   computer-aided transcription; that the foregoing
12   transcript is a true and complete record of the
13   proceedings which then and there took place, and that the
14   signature of the witness was waived by agreement of
15   counsel.
16       IN WITNESS WHEREOF I have hereunto subscribed my
17   hand and affixed my official seal this 16th day of
18   February, 2018.

19

20

21

22       Stacey Bleyer
         IL CSR #084-003358

23

24

Northcutt Reporting Service
(618) 242-1737

Electronically signed by Stacey Bleyer (601-034-510-1524)                    17fe6e1d-17a1-4258-8144-26f8282d7e91